PRESENT: All the Justices

ARCH INSURANCE COMPANY

OPINION BY
v. Record No. 211050                                   JUSTICE THOMAS P. MANN
                                                       DECEMBER 29, 2022

FVCBANK

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

This appeal turns on the legal principle that when a company obtains a right through subrogation, that company is placed in the position of its subrogor and can have no greater rights than those of the subrogor. Arch Insurance Company ("Arch") appeals from the judgment of the Fairfax County Circuit Court striking Arch's conversion and unjust enrichment claims. Arch asserts that the circuit court erred by refusing to permit Arch's forensic accounting expert to testify, and by granting FVCbank's motion to strike Arch's claims. Both of Arch's assignments of error stem from the circuit court's underlying legal conclusion that Arch was incapable of demonstrating a priority right to the disputed funds as a matter of law. Because Arch's rights were limited to those of its subrogor, Dominion Mechanical Contractors, Inc. ("Dominion"), we agree with the circuit court and affirm the judgment below.

BACKGROUND

Dominion is a subcontractor based in Fairfax, Virginia, that provides mechanical and plumbing work for various construction projects. When the underlying cause of action arose, Dominion subcontracted from certain general contractors, like the Whiting-Turner Contracting Company ("Whiting-Turner") and itself subcontracted to various labor, equipment, and materials suppliers, and subcontractors (collectively, the "Suppliers").

## I.  Dominion obtains a line of credit from FVCbank

In May 2017, Dominion and FVCbank executed a loan agreement, providing Dominion with an $8,000,000 revolving line of credit (the "Line of Credit Agreement").  From that line of credit, FVCbank would advance up to 80% of the billed accounts receivable on contracts which were not subject to surety bonds, while funds from bonded contracts would be excluded in the calculation of available credit.  Dominion was required to consistently update FVCbank with certifications of the available accounts receivable, as well as whether those receivables were from bonded or non-bonded contracts.

Dominion maintained four accounts with FVCbank:  a payroll account, a money market savings account, a primary operating account (the "Operating Account"), and a cash management account ("the Cash Collateral Account").  Dominion was required to maintain the Operating Account and the Cash Collateral Account with FVCbank until Dominion's obligations were satisfied.  The Operating Account would draw directly from the line of credit.  Incoming payments from third parties for projects would be deposited in the Cash Collateral Account and the Operating Account.  The Cash Collateral Account would be "swept," or emptied, daily to pay down the line of credit.  Funds in the Operating Account would then be used by Dominion to make third-party payments, transferred to the payroll account to fund employee payroll, or transferred to the money market savings account.

In exchange for the revolving line of credit, Dominion granted FVCbank a "perfected and continuing security interest in" among other things, "all of [Dominion]'s . . . deposit accounts with any financial institution with which [Dominion] maintains deposits, whether now owned or

2

existing or hereafter acquired or arising," and "all Proceeds and products of the foregoing."[1] Additionally, the Line of Credit Agreement defined "Collateral" in part as "all property of [Dominion] subject from time to time to the Liens of this Agreement" and any of the loan documents. Under the Line of Credit Agreement, "Lien" included any "security interest . . . of any kind in real or personal property securing any indebtedness . . . owed to, or claimed to be owed to, a Person, all whether perfected or unperfected, avoidable or unavoidable, based on the common law, statute or contract or otherwise."[2] Thus, "Collateral" included Dominion's "deposit accounts with any financial institution" and "all Proceeds and products" thereof.

The Line of Credit Agreement further outlined how Dominion would trigger a default if it failed to comply with certain covenants. A default would, in turn, entitle FVCbank to certain remedies regarding Dominion's deposit accounts. Among the remedies available to FVCbank were specific rights regarding Collateral. A default would entitle FVCbank to declare any and

---

[1] The Line of Credit Agreement defined "Proceeds" as "the meaning described in the Uniform Commercial Code as in effect from time to time." Code § 8.9A-102(a)(64) generally defines "Proceeds" as

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>
> (B) whatever is collected on, or distributed on account of, collateral;
>
> (C) rights arising out of collateral;
>
> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
>
> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

[2] The Line of Credit Agreement defined "Person" as "an individual, a corporation, a partnership, a joint venture, a limited liability company or partnership, a trust, an unincorporated association, a Governmental Authority, or any other organization or entity."

3

all of the outstanding loan obligations due and payable, without notice to Dominion. Moreover, FVCbank could, without notice to Dominion, "demand, collect, receipt for and give renewals, extensions, discharges and releases of any of the Collateral" and "take any other action necessary or beneficial to realize upon or dispose of the Collateral or to carry out the terms of th[e] Agreement." Importantly, in the event of default, FVCbank was authorized by Dominion "without notice to, or consent of, [Dominion], to set off, appropriate, seize, freeze and apply any or all items . . . against all Obligations then outstanding (whether or not then due), all in such order and manner as shall be determined by [FVCbank] in its sole and absolute discretion."[3]

At the same time the Line of Credit Agreement was executed, Dominion executed a commercial promissory note for the line of credit (the "Line of Credit Promissory Note") for up to $8,000,000. Dominion and FVCbank also entered into a security agreement (the "Security Agreement") granting FVCbank a "first priority security interest in" among other things, all of Dominion's "presently existing or hereafter acquired or created accounts."

Importantly, Dominion and FVCbank executed a Collateral Assignment and Security Agreement, specifically governing two of Dominion's accounts at FVCbank: the Operating Account and the Cash Collateral Account, funded by receivables from Dominion's contracts. The Collateral Assignment and Security Agreement explicitly assigned a security interest in the two accounts to FVCbank, prohibited Dominion from withdrawing any money from the Cash Collateral Account without permission from FVCbank, and provided the bank with a right of offset. Under the right of offset, if Dominion defaulted, FVCbank could apply "any or all of" the two accounts to Dominion's unpaid debt.

---

[3] The Line of Credit Agreement defined "Obligation" to include "all present and future indebtedness . . . in connection with . . . the provisions of [the loan documents]."

4

At the same time, a Uniform Commercial Code ("UCC") financing statement was filed in favor of FVCbank covering "all presently existing or hereafter acquired or created accounts, [and] accounts receivable."

## II. Arch issues surety bonds to Dominion

Beginning in May 2018, Arch, a surety company, issued contract surety bonds,[4] also called "payment and performance" bonds, for some of Dominion's projects. The bonds at issue in this case were for three projects: Capital One Block C Project, Capital One Performing Arts Center Project, and Fleet Elementary School Project. Performance bonds were issued to ensure performance of a project by Dominion for Whiting-Turner, a general contractor. The performance bonds were accompanied by payment bonds, to ensure Dominion's payment of its obligations to the Suppliers. If Dominion were unable to meet its obligations to Whiting-Turner or the Suppliers, Arch would satisfy the claims owed by Dominion.

Contract surety bonds are often accompanied by general indemnity agreements, to ensure the surety's rights if the bonds go into default. The bonds issued by Arch to Dominion were accompanied by the General Indemnity Agreement (the "GIA") executed May 16, 2018. The GIA stated that it was a security agreement under the UCC and contained an assignment provision, in which Dominion assigned all of its rights under bonded contracts to Arch, in the event of default. Moreover, Paragraph 25 of the GIA,[5] titled TRUST FUNDS, provided:

> [Dominion] and Indemnitors agree and expressly declare that all funds due or to become due under any Bonded Contract are trust funds, whether in the possession of [Dominion] or another and whether designated trust funds or not, for the

---

[4] Contract surety bonds are issued to ensure the contractor will meet its "payment and performance obligations to other contractors." Here, the bonds were issued by Arch, the surety, to Dominion, the principal.

[5] "Indemnitors" included "All Persons who sign this Agreement or whose representatives sign this Agreement or any other agreement that incorporates by reference the terms of this Agreement."

benefit and payment of all persons to whom [Dominion] incurs obligations in the performance of such contract, for which [Arch] may be liable under any Bond. If [Arch] discharges any such obligation, it shall be entitled to assert the claim of such person to the trust funds.

Crucially, FVCbank was not a party to the GIA or related agreement, and therefore not an Indemnitor.

### III. Dominion and FVCbank agree to a term loan and amend the loan documents

In July 2018, Dominion "failed to comply with the imposed restrictions regarding distributions to its shareholders," which was a designated event of default under the Line of Credit Agreement with FVCbank. As a result, Dominion and FVCbank agreed to an amendment to the Line of Credit Agreement and other loan documents (the "First Amendment"). The First Amendment's covenants were cumulative with those in the original agreement, and the First Amendment did not affect FVCbank's rights in the event of default.

In February 2019, Dominion and FVCbank executed a loan agreement providing Dominion with a term loan from FVCbank for $1,500,000 (the "Term Loan Agreement"). Under the Term Loan Agreement, Dominion was bound by all the non-monetary covenants set forth in the Line of Credit Agreement and other loan documents, and violation of any of those covenants constituted an event of default. The Term Loan Agreement provided that in the event of default, FVCbank was entitled to all remedies provided in the loan documents, and to declare all outstanding debt under the term loan due and payable. Moreover, Dominion agreed "to allow the UCC-1 Financing Statement filed with the Virginia State Corporation Commission against the collateral property described in the Security Agreement to remain a matter of record." At the same time, Dominion also executed a commercial promissory note for the term loan (the "Term Loan Note") for $1,500,000.

6

Dominion and FVCbank also amended the Line of Credit Agreement a second time in February 2019 ("Second Amendment"). They agreed that Dominion had breached the Line of Credit Agreement again by failing to maintain the debt ratio required by the agreement. The Second Amendment lowered the line of credit to $7,500,000 and restricted the available credit to $7,000,000 until the term loan was fully repaid. The Second Amendment's covenants were cumulative with those in the original agreement, and the Second Amendment did not affect FVCbank's rights in the event of default. FVCbank and Dominion also amended the Security Agreement to cover the revised amount of the line of credit and the term loan and agreed that the UCC-1 financing statement would cover both of Dominion's debts to FVCbank.

IV. Dominion's financial struggles mount

In June 2019, Dominion began to seek financial assistance from Arch to pay Suppliers. To analyze Dominion's financial situation Arch hired a financial consultant, who informed Arch that Dominion could not obtain additional financial support from FVCbank. In July, Arch requested that Dominion deposit all bonded project receivables into a separate trust account so that it would not have a contest with FVCbank over those funds.

In August, Arch and Dominion entered into an Interim Financial Assistance Agreement ("IFAA"). The IFAA contained voluntary letters of default indicating that Dominion was in default to Arch under the GIA, and that Dominion would request that FVCbank establish a segregated account for bonded funds. In conjunction with the IFAA, Dominion executed a promissory note in favor of Arch for $3,865,079.69. Arch advanced the same amount to Dominion for payment to the Suppliers.

Throughout the summer, Dominion had requested that FVCbank set up a separate trust account for bonded receivables. At no point did FVCbank agree to set up a separate trust

7

account. Dominion continued to deposit its bonded and nonbonded receivables into its general deposit accounts at FVCbank through August 16, 2019. On August 15, FVCbank froze Dominion's accounts. FVCbank swept approximately $2,500,000 from Dominion's accounts to pay down the term loan and the line of credit.

### V. The litigation

After FVCbank froze Dominion's accounts, Arch and Dominion sued the bank, claiming conversion and unjust enrichment. Arch, in its case in chief, attempted to call an expert, David Stryjewski ("Stryjewski"), to testify about the tracing of bonded funds from Dominion's accounts. FVCbank objected to Stryjewski's expert testimony on relevance grounds. The bank argued that testimony regarding tracing was irrelevant, because as a matter of law all the funds, bonded and nonbonded alike, were commingled and the bank had a priority interest in the accounts. Arch responded that the bank was on notice that the bonded funds were to be held in trust, and therefore had no right to offset the funds.[6] The circuit court sustained the objection, ruling, "I find as a matter of law that we do not need the testimony of a tracing expert and I sustain [FVCbank]'s objection to the gentleman testifying as a tracing expert."

At the close of Arch's evidence, FVCbank moved to strike Arch's claims of conversion and unjust enrichment. FVCbank argued that Dominion was in default, and therefore the bank's security interest took priority over any claim by Arch. Arch responded that there may have been sufficient evidence of default but would not stipulate to that point, claiming "[w]e didn't put on any evidence - we're not Dominion - as to whether they are or are not in default."[7] Arch

---

[6] Arch has made no argument, below or on appeal, regarding any event of default with respect to the relevance of Stryjewski's testimony.

[7] On appeal, Arch concedes that "[t]he trial court did find that Dominion defaulted under its loan agreement with FVCbank, a different issue which is not contested in this appeal." (Reply Br. 5, n.3).

reiterated its argument that FVCbank should have been on notice of the trust character of the bonded funds and therefore there was sufficient evidence of conversion and unjust enrichment. The circuit court granted FVCbank's motion to strike Arch's claims. The court found that, even in the light most favorable to Arch, because FVCbank had a priority interest in Dominion's accounts, there was no legal claim for unjust enrichment or conversion. Arch brought this appeal.

## ANALYSIS

The circuit court concluded that, as a matter of law, Arch would be unable to demonstrate a superior claim to the disputed funds. Both of Arch's assignments of error turn on that legal conclusion, and the application of that conclusion to the admission of expert testimony and FVCbank's motion to strike the conversion and unjust enrichment claims.

### I. Standard of Review

Regarding the testimony of Arch's tracing expert, we review "a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard." *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 575 (2011). A court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 426 (2012) (quoting *Landrum v. Chippenham & Johnston–Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). Moreover, a court "by definition abuses its discretion when it makes an error of law." *Helmick Family Farm, LLC v. Comm'r of Highways*, 297 Va. 777, 794 (2019) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)).

9

With respect to FVCbank's motion to strike, we "review a circuit court's decision on a motion to strike in the light most favorable to the non-moving party," in this case, Arch. *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). Moreover, "the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)).

## II. Arch's expert witness

Generally, "[a]ll relevant evidence is admissible," except as otherwise provided by law. Va. R. Evid. 2:402(a). Relevant evidence is that which has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401.

If FVCbank had a superior right to the disputed funds over Arch as a matter of law, no amount of expert testimony on tracing would affect the outcome and the expert testimony would be irrelevant. Yet, the facially simple issue of relevance requires an analysis of the complex conflict between FVCbank's security interest and Arch's security interest acquired through subrogation.

### A. FVCbank's interest in Dominion's deposit accounts

FVCbank's interest in Dominion's bank deposits is governed by the loan documents. FVCbank first obtained a security interest in Dominion's deposit accounts in 2017, as part of the Line of Credit Agreement, the Security Agreement, and the Collateral Assignment and Security Agreement. Additionally, a UCC-1 financing statement was filed with the State Corporation Commission, reflecting the bank's security interest. FVCbank's security interest in the deposit accounts was unaffected by the First Amendment, the Second Amendment, or the Term Loan Agreement.

10

Importantly, FVCbank's security interest was perfected by its control over the deposit accounts. Under the UCC, "a security interest in a deposit account may be perfected only by control under § 8.9A-314" except for "proceeds" as provided in Code § 8.9A-315(c) and (d). Code § 8.9A-312(b)(1).

Code § 8.9A-314(a) provides that a security interest in a deposit account "may be perfected by control of the collateral under . . . [§] 8.9A-104." In turn, Code § 8.9A-104(a)(1) states that "[a] secured party has control of a deposit account if: . . . the secured party is the bank with which the deposit is maintained." Here, Dominion's accounts were maintained at FVCbank, and FVCbank was the secured party under the loan documents. Moreover, since FVCbank had a perfected security interest in the entirety of Dominion's deposit accounts, the exceptions provided in Code §§ 8.9A-315(c) and (d) are not applicable.

The loan documents provided that, in the event of default, FVCbank had the right to offset any of Dominion's accounts against the company's outstanding debts to FVCbank. Neither party contests on appeal that Dominion was in default at the time FVCbank exercised its rights under the loan documents, and neither party raised the issue of default with respect to the relevance of Stryjewski's testimony.

Therefore, as between FVCbank and Dominion, given Dominion's default, FVCbank had a clear right under the loan documents to offset Dominion's deposit accounts against the company's debt. Next, we turn to Dominion's relationship with Arch, and whether that relationship impacts FVCbank's clear right of offset.

### B. Arch's interest in Dominion's deposit accounts

Arch's interest in Dominion's deposit accounts is set forth in the GIA and the IFAA. The GIA stated that it was a security agreement under the UCC and authorized the filing of a UCC

11

financing statement reflecting the same. Yet, the record contains no evidence that Arch filed a UCC financing statement prior to FVCbank sweeping Dominion's deposit accounts.

A security interest in a deposit account "may be perfected only by control under § 8.9A-314." Code § 8.9A-312(b)(1). A secured party can have control of a deposit account under three circumstances:

> (1) the secured party is the bank with which the deposit account is maintained;
> (2) the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or
> (3) the secured party becomes the bank's customer with respect to the deposit account.

Code § 8.9A-104. Arch is not the bank where Dominion's deposit accounts are maintained and is not the bank's customer with respect to the accounts. Moreover, there is no agreement that the bank would comply with instructions from Arch regarding the purported trust funds. Therefore, Arch's security interest in the deposit accounts was not perfected. Likewise, Arch did not have a perfected interest in the proceeds from the bonded contracts because Arch did not file a UCC financing statement covering the original bonded contract funds, and "a security interest in proceeds is a perfected security interest if the security interest in the collateral was perfected." Code § 8.9A-315(c).

The GIA provided for assignment of Dominion's rights under bonded contracts to Arch in the event of default. This subrogation right was confirmed and explicitly not waived by the IFAA. The GIA also contained specific language designating the proceeds of bonded contracts as trust funds and requiring Dominion to hold them as such. The IFAA required Dominion to set up a trust account and reiterated the purported trust nature of the funds. Thus, in addition to the

12

security interest provided in the GIA, Arch acquired an equitable interest through subrogation in Dominion's deposit accounts.

### C.  FVCbank and Arch's competing interests in the deposit accounts

Having detailed the nature of Arch's interest in Dominion's accounts, we analyze the competing claims of Arch and FVCbank under the UCC and Virginia caselaw.

### 1.  Claims of FVCbank and Arch under the UCC

Under the UCC, FVCbank's perfected security interest takes priority over Arch's unperfected security interest.  Code § 8.9A-327 outlines the priority rules when there are conflicting security interests in the same deposit accounts.  The first rule of priority controls the outcome here.  Code § 8.9A-327(1) provides that "[a] security interest held by a secured party having control of the deposit account under § 8.9A-104 has priority over a conflicting security interest held by a secured party that does not have control."  FVCbank has a perfected security interest through control of the deposit; Arch does not.

The second priority rule is inapplicable.  Code § 8.9A-327(2) ranks "security interests perfected by control . . . according to priority in time of obtaining control."  Since Arch never obtained control or perfected its interest, this rule does not apply.

The third priority rule supports FVCbank's priority interest.  That rule provides that "a security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party."  Code § 8.9A-327(3).  Thus, the bank's security interest has priority over Arch's conflicting security interest.

The last possible exception, priority rule four, provides that "[a] security interest perfected by control under § 8.9A-104 (a)(3) has priority over a security interest held by the bank with which the deposit account is maintained."  Code § 8.9A-327(4).  Arch's security interest

13

was not perfected at all, much less by control under § 8.9A-104(a)(3). Therefore, under the UCC, FVCbank's security interest in the account takes priority over Arch's interest as a matter of law.

### 2. Equitable subrogation and trust character

Arch argues that it nonetheless had a superior interest in the bonded deposits under the doctrine of equitable subrogation, and that FVCbank was on notice of Arch's claimed right to the funds because of their trust status. This argument fails for two reasons.

First, Arch's interest is a claimed right of subrogation and cannot exceed the rights of Dominion. Subrogation refers to "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right . . . so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities," *Reynolds Metals Co. v. Smith*, 218 Va. 881, 883 (1978) (quoting Black's Law Dictionary 1595 (rev. 4th ed.1968)), and "the substitution of one for another as a creditor so that the new creditor succeeds to the former's rights in law and equity." *Id.* (quoting Webster's Third New International Dictionary 2278 (1969)). In *Peerless Insurance Co. v. County of Fairfax*, this Court succinctly applied this definition, reasoning that where a subrogee steps into the shoes of a principal, it "can have no greater rights than [the principal]." 274 Va. 236, 247 (2007). That principle holds true in this case. Arch's subrogation right permits the surety to step into the shoes of Dominion; that subrogation right is limited to the rights of Dominion. Arch cannot exceed the rights of Dominion, and Dominion already provided a priority security interest to FVCbank. Regardless of the bonded or nonbonded character of Dominion's funds, Arch only obtained Dominion's right to the deposit accounts – a right Dominion had already signed away.

14

Second, Arch's argument fails because FVCbank never agreed to hold the bonded funds in trust.  In Virginia, "[t]he general rule is that 'the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor.  The moneys deposited immediately become the property of the bank, and the latter becomes [a] debtor of the depositor.'"  *Bernardini v. Cent. Nat. Bank of Richmond*, 223 Va. 519, 521 (1982) (quoting *Fed. Rsrv. Bank of Richmond, Va. v. State & City Bank & Tr. Co.*, 150 Va. 423, 430-31 (1928)).  In *Bernardini*, a couple deposited funds into their bank, where the husband had significant business debt.  *Id.* at 520.  The Bernardinis conceded that they did not designate those funds "for a specific purpose and that the bank had no knowledge of the sources of the funds."  *Id.* at 521.  The bank then offset those funds against the business debt.  *Id.* at 520.  This Court held that "by depositing the checks in a general account and commingling them with other nonexempt money, the Bernardinis' funds lost whatever exemptions they may have had."  *Id.* at 522.

Here, Dominion deposited funds into FVCbank accounts while expecting them to be held in trust.  Dominion notified FVCbank of that purpose and requested a trust account, which FVCbank denied.  Thus, the events here resemble those in *Bernardini*, except for the ineffectual notice provided by Arch to FVCbank and the request that Dominion establish a trust account for bonded receivables.

The issue of notice and trust funds was addressed by this Court in *Williams v. Dickenson County Bank, Inc*.  175 Va. 359, 363-64 (1940).  There, the Court held that "[i]n the absence of a clear agreement to the contrary, expressed or implied, a deposit is presumed to be a general deposit."  *Id.*  The Court explicitly stated that this presumption applies

> even though the depositor styles himself a fiduciary and the funds
> are credited to a separate fiduciary account, . . . even though the
> funds are known by the bank to be trust funds, and . . . even if the
> funds are to be used for a particular purpose, so long as the

15

> depositor assents to their being commingled with the general funds of the bank.

*Id.* at 364.

Arch contends that this principle is not controlling, and instead argues that a bank is required to treat funds as special deposits when the bank knows the funds are intended to be trust funds. Arch first cites *Overseers of the Poor of Norfolk v. Bank of Virginia* for the proposition that the law "entitle[s] a principal, in all cases where he can trace his property, whether it be in the hands of the agent, or of his representatives, or assignees, to reclaim it, unless it has been transferred *bona fide* to a purchaser of it, or assignee for value, without notice." 43 Va. (2 Gratt.) 544, 548 (1846).

Arch's argument regarding *Overseers of the Poor* fails because its interest was obtained through subrogation – Arch is not a principal. Dominion, the principal, already transferred a security interest to FVCbank in the event of default. Therefore, there is simply no property interest belonging to Arch for Arch to trace.

Arch next cites *Peoples National Bank v. Coleman*, where this Court stated that "[w]here trust funds are deposited with a bank, and the bank has notice of their trust character, it has no right to appropriate them to the payment of the individual debt of the depositor due from him to it." 175 Va. 483, 487 (1940) (citing *Fed. Rsrv. Bank of Richmond*, 150 Va. at 438).

In that case, J.B. Coleman sued Peoples National Bank of Pulaski, claiming that the bank refused to honor a check written to him by R.S. Cecil. *Id.* at 484. Cecil, a real estate agent, sold a property for Coleman and deposited the amount due to Coleman in his bank account. *Id.* at 485. The account was explicitly in the name of "R.S. Cecil, agent," even though the check was originally written to Cecil in his individual capacity. *Id.* at 487. Thus, unlike here, the bank had designated the account as one of an agent, and it was not a general deposit account. *Id.* This

16

Court therefore concluded that the bank had no right to offset those funds against Cecil's personal debt. *Id.* at 488.

Relatedly, *Federal Reserve Bank of Richmond* directly contradicts Arch's position in this case. There, the Bank of Virgilina ("Virgilina") was in debt to State and City Bank ("State and City") and had an ordinary checking account with the bank. *Fed. Rsrv. Bank of Richmond*, 150 Va. at 426-27. When Virgilina closed, State and City offset Virgilina's deposits against the debt. *Id.* at 427. Virgilina had also written a check to the Federal Reserve Bank of Richmond, but State and City did not know the check was outstanding. *Id.* at 427-28. While the Court cited language indicating that the bank's knowledge was relevant, the Court concluded that the Federal Reserve Bank "had no equity . . . in the account of the Virgilina Bank . . . which was superior to the equity of" State and City. *Id.* at 440-41. Moreover, "[w]hen the Federal Reserve Bank presented its check from [Virgilina] these funds had not only been blended with the funds credited to [Virgilina] in [State and City], but they had been credited on the notes then due by [Virgilina] to [State and City]." *Id.* at 441. As a result, the Court held that State and City had the right to offset Virgilina's commingled deposits against the outstanding debt. *Id.*

The law of equitable subrogation does not permit Arch to rise above the rights of its subrogor, Dominion. Moreover, any equitable interest Arch had in Dominion's deposit accounts was destroyed when the funds were deposited in a general deposit account, and Dominion and the bank never agreed to create a trust account. FVCbank was not required to treat the funds as trust deposits simply because Dominion and Arch claimed as much. Nor was it required to pick its own pocket and enable Arch to circumvent the bank's priority interest under the UCC.

Under the UCC and Virginia caselaw, FVCbank's interest in Dominion's deposit accounts was superior to Arch's interest as a matter of law. As a result, in the evidentiary

17

proceeding below, any testimony on the tracing of accounts was irrelevant, because FVCbank's claim was superior regardless of the bonded character of the deposits.

### III.  FVCbank's motion to strike

The circuit court relied on the same legal analysis in granting FVCbank's motion to strike, concluding that because FVCbank's claim to the disputed funds was superior as a matter of law, Arch's conversion and unjust enrichment claims failed.

### A.  Conversion

Applying the legal conclusion that FVCbank's interest was superior to that of Arch, addressed above, the circuit court correctly concluded that there was insufficient evidence of conversion.  "Conversion is 'any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.'"  *Mackey v. McDannald*, 298 Va. 645, 659 (2020) (alteration in original) (quoting *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994)).

Here, FVCbank did not commit a "wrongful exercise or assumption of authority" over Arch's goods.  There is no dispute on appeal that Dominion was in default when FVCbank offset the deposit accounts against Dominion's outstanding debt.  FVCbank had a superior interest in Dominion's deposit accounts under both the UCC and the doctrine of equitable subrogation.  *See supra*, section III.C.  As a result, there was insufficient evidence to support a claim of conversion.

### B.  Unjust enrichment

Likewise, the evidence was insufficient as a matter of law for Arch's unjust enrichment claim.  To state a cause of action for unjust enrichment, a plaintiff must allege that:  (1) the

18

plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp. II*, 276 Va. 108, 116 (2008).

FVCbank had a superior claim to Arch under the UCC and equitable subrogation. As a result, there was no benefit improperly retained by FVCbank that the bank should have expected to repay. Thus, there was insufficient evidence to make out a claim of unjust enrichment by FVCbank.

In sum, because FVCbank had a superior claim to Dominion's deposit accounts over Arch, the circuit court did not err in granting the bank's motion to strike as to conversion and unjust enrichment.

## CONCLUSION

The circuit court correctly concluded that FVCbank's interest in Dominion's deposit accounts took priority over Arch's interest as a matter of law. Given that conclusion, the court properly excluded the testimony of Arch's "tracing" expert and granted FVCbank's motion to strike, dismissing the claims with prejudice. Thus, we affirm the judgment of the circuit court.

*Affirmed.*